# EXHIBIT

# II

COPY

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

### DIVISION FOUR

In re DERRECK SUNDERLAND,

on Habeas Corpus.

A116379

FILED
Court of Appeal First Appellate District

MAR 0 8 2007

Diana Herbert, Clerk
By_____Deputy Clerk

(San Francisco County
Super. Ct. No. 5416)

BY THE COURT:

The petition for a writ of habeas corpus is denied.

(Ruvolo, P.J., Reardon, J., and Sepulveda, J., joined in the decision.)

Date: _____ ___RUVOLO, P.J.___ ___P.J.

# EXHIBIT 8

1

2

3      **FILED**

4      DEC 2 9 2004

5      CLERK, U.S. DISTRICT COURT
       EASTERN DISTRICT OF CALIFORNIA
6

7

8                  United States District Court

9                  Eastern District of California

10

11

12   Melvyn H. Coleman,                    No. Civ. S-96-0783 LKK PAN P

13            Petitioner,                  Findings and Recommendations

14       vs.

15   Board of Prison Terms, et al.,

16            Respondents.

17                              -oOo-

18        Petitioner seeks a writ of habeas corpus.

19        In his November 14, 1997, second amended petition petitioner

20   claims his federal due process guarantee was violated because the

21   California Board of Prison Terms (Board) has failed to conduct a

22   fair parole suitability hearing.

23        In 1974 petitioner was convicted of first degree murder,

24   attempted murder, first degree robbery, first degree burglary and

25   other charges.  The victims, Mr. And Mrs. Siewart, returned to

26   their home while petitioner was burglarizing it; he then

1   approached before they got out of their car and robbed and shot
2   them, killing Mr. Siewart and seriously wounding Mrs. Siewart.
3   Petitioner had a prior juvenile record.

4       Under California law, a prisoner including a convicted
5   murderer serving an indeterminate term (i.e., seven years to
6   life) is entitled to a hearing before a panel composed of members
7   of the Board to determine his suitability for parole.  By
8   statute, parole at some point normally is appropriate and the
9   Board "shall set a release date unless it determines that the
10  gravity of the current convicted offense or offenses, or the
11  timing and gravity of current or past convicted offense or
12  offenses, is such that consideration of the public safety
13  requires a more lengthy period of incarceration. . . ."  Cal.
14  Penal Code § 3041(b).  Procedures  governing suitability hearings
15  are set forth in Penal Code § 3041.5 (providing prisoners with
16  notice and an opportunity to be heard and requiring a written
17  statement of reasons if the panel refuses to set a parole date).
18  Regulations prescribe factors for the panel to consider in
19  determining whether each prisoner is suitable or unsuitable for
20  parole.  15 CAC § 2281.[1]

21

22  [1] Factors supporting a finding of unsuitability include: (1) whether the
    prisoner's offense for which he is confined was committed in an "especially
23  heinous, atrocious or cruel manner"; (2) the prisoner's record of violence prior
    to the offense; (3) whether the prisoner has an unstable social history; (4)
24  whether the prisoner has committed sadistic sexual offenses; (5) whether the
    prisoner has a lengthy history of severe mental problems related to the offense;
25  and (6) whether the prisoner has engaged in serious misconduct in prison or jail.
    Factors supporting a finding of suitability include: (1) whether the prisoner has
26  a juvenile record; (2) whether the prisoner has experienced reasonably stable
    relationships with others; (3) whether the prisoner shows signs of remorse; (4)

2

1    Petitioner presents evidence that under Governors Wilson and
2  Davis the Board disregarded regulations ensuring fair suitability
3  hearings and instead operated under a sub rosa policy that all
4  murderers be found unsuitable for parole. The record shows that
5  between 1992 and 1998 less than one percent of the prisoners in
6  this group were released on parole. During the previous period
7  the parole rate had been about four percent. Petitioner presents
8  sworn testimony that the policy was enforced by (1) appointing
9  Board members less likely to grant parole and more willing to
10  disregard their statutory duty; (2) removing Board members more
11  likely to grant parole; (3) reviewing decisions finding a
12  prisoner suitable and setting a new hearing before a different
13  panel; (4) scheduling rescission hearings for prisoners who had
14  been granted a parole date; (5) re-hearing favorable rescission
15  proceedings and hand-picking panels to ensure the desired
16  outcome; (6) panel members agreeing upon an outcome in advance of
17  the hearing; and (7) gubernatorial reversal of favorable parole
18  decisions. See e.g., declaration of former BPT Commissioner
19  Albert Leddy (Leddy) paras. 5, 6, 8-17, 20 (attached as Ex. 17 to
20  petitioner's March 27, 2003, motion for discovery); deposition of
21  Leddy taken in In re Fortin, et al., San Diego Superior Court

22 _____

23  whether the prisoner committed his crime as the result of significant stress in his life; (5) whether the prisoner suffered from Battered Woman Syndrome when she
24  committed the crime; (6) whether the prisoner lacks any significant history of violent crime; (7) whether the prisoner's present age reduces the probability of
25  recidivism; (8) whether the prisoner has made realistic plans for release or has developed marketable skills that can be put to use on release; and (9) whether
26  the prisoner's institutional activities indicate an enhanced ability to function within the law upon release. 15 CAC § 2281.

3

1  case number HSC10279 at 18-19, 47-50, 56-59, 61-63, 65-66, 88-89,
2  95, 97-99, 102, 106, 110, 118 & 126 (attached as Ex. 10 to
3  petitioner's March 27, 2003, motion for discovery); deposition of
4  former BPT Commissioner Edmund Tong taken in Kimble v. Cal. BPT,
5  C.D. Cal. case number CV 97-2752 at 42-43, 45-47, 71, 73, 80-82,
6  85-86, 96, 103, 105, 107 & 109 (lodged December 30, 2003).[2]

7        The unrefuted record shows the no-parole-for-murderers
8  policy existed and continued under Governor Davis.  In In re
9  Rosencrantz, the California Supreme Court took note of evidence
10 presented in the state trial court establishing that the Board
11 held 4800 parole suitability hearings between January 1999
12 through April 2001, granting parole to 48 murderers (one
13 percent).  29 Cal. 4th 616, 685 (2003).  Of those 48, the
14 governor reversed 47 of the Board's decisions and only one
15 murderer out of 4800 actually was released on parole.  Id.
16 Petitioner in Rosenkrantz also submitted evidence of the
17 following interview of Governor Davis reflected in the April 9,
18 1999, edition of the Los Angeles Times: " '. . . [T]he governor
19 was adamant that he believes murderers - even those with second-
20 degree convictions - should serve at least a life sentence in
21 prison. [Para.]  Asked whether extenuating circumstances should

22

23 _____
   [2] Meanwhile, the annual cost to taxpayers of conducting these "pro forma"
24 hearings is enormous, amounting to millions of dollars per year.  See Exhibit 7
   to petitioner's March 27, 2003, motion for discovery (California Legislative
   Analyst's Office - Analysis of the 2000-01 Budget Bill for the Board of Prison
25 Terms criticizing proposed $19 million annual budget and noting huge cost of
   additional incarceration resulting from no-parole policy).

26

4

1  be a factor in murder sentences, the governor was blunt: "No.
2  Zero . . .  They must not have been listening when I was
3  campaigning. . . .  If you take someone else's life, forget it.
4  I just think people dismiss what I said in the campaign as either
5  political hyperbole or something that I would back away from . .
6  . .  We are doing exactly what we said we were going to do."'"
7  29 Cal. 4th at 684.

8      Respondent does not refute the alleged facts.  Instead,
9  respondent argues that, assuming arguendo prisoners in California
10 have an interest in a parole date protected by the due process
11 clause, constitutional requirements are met so long as there is
12 "some evidence" supporting the findings petitioner is unsuitable.
13 See Oppo. at 7:20 (so long as "some evidence" standard is met,
14 "the Board decisions could not have been arbitrary.")  For the
15 reasons explained, this court rejects that claim.  As this court
16 previously has found, there always will be "some evidence" that
17 can be used to explain a denial or rescission under the
18 circumstances.  Federal due process requires more.

19     California's parole scheme gives rise to a protected liberty
20 interest in release on parole.  McQuillion v. Duncan, 306 F.3d
21 895, 902 (2002); Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389,
22 1390 (9th Cir. 1987); Greenholtz v. Inmates of Nebraska Penal &
23 Correctional Complex, 442 U.S. 1 (1979); Biggs v. Terhune, 334
24
25
26

5

1 | F.3d 910, 915 (9th Cir. 2003); In re Rosenkrantz, 29 Cal. 4th 616
2 | (2003).[3]

3    Therefore, petitioner is entitled to the process outlined in
4 | Greenholtz, viz., notice, opportunity to be heard, a statement of
5 | reasons for decision, and limited right to call and cross-examine
6 | witnesses.  The determination that petitioner is unsuitable for
7 | parole must be supported by some evidence bearing some indicia of
8 | reliability.

9    These guarantees do not exhaust petitioner's right to due
10 | process.  The fundamental core of due process is protection
11 | against arbitrary action:

12      The principal and true meaning of the phrase has never
       been more tersely or accurately stated than by Mr.
13      Justice Johnson, in Bank of Columbia v. Okely, 17 U.S.
       235, 4 Wheat. 235-244, 4 L.Ed. 449 [(1819)]: "As to the
14      words from Magna Charta, incorporated into the
       Constitution of Maryland, after volumes spoken and
15      written with a view to their exposition, the good sense
       of mankind has at last settled down to this: that they
16      were intended to secure the individual from the
       arbitrary exercise of the powers of government,
17      unrestrained by the established principles of private
       right and distributive justice."
18
   Hurtado v. California, 110 U.S. 516, 527, (1884).  "The
19
   concessions of Magna Charta were wrung from the king as
20
   guaranties against the oppressions and usurpations of his
21
22

23   [3] That is so because the parole statute, Penal Code § 3041, uses mandatory
     language ("The panel or board shall set a release date unless it determines"
24   further incarceration is necessary in the interest of public safety) which
     "'creates a presumption that parole release will be granted," unless the
25   statutorily defined determinations are made.  Board of Pardons v. Allen, 482 U.S.
     369, 378 (1987) (quoting Greenholtz, 442 U.S. at 12).  As of 1988, by amendment
26   of the state constitution, a parole date given can be withdrawn by the Governor
     under the same factors considered by the Board.

                                   6

1  prerogative."  Id. at 531.  "The touchstone of due process is
2  protection of the individual against arbitrary action of
3  government."  Wolff v. McDonnell, 418 U.S. 539, 558 (1974),
4  citing Dent v. West Virginia, 129 U.S. 114 (1889).

5      A government official's arbitrary and capricious exercise of
6  his authority violates the essence of due process, contrary to
7  centureis of Anglo-American jurisprudence.  See Yick Wo v.
8  Hopkins, 118 U.S. 356, 369 (1886) ("When we consider the nature
9  and the theory of our institutions of government, the principles
10 upon which they are supposed to rest, and review the history of
11 their development, we are constrained to conclude that they do
12 not mean to leave room for the play and action of purely personal
13 and arbitrary power."); United States v. Lee, 106 U.S. 196, 220
14 (1882) ("No man in this country is so high that he is above the
15 law.  No officer of the law may set that law at defiance with
16 impunity.  All the officers of the government from tne highest to
17 the lowest, are creatures of the law and are bound to obey it.
18 It is the only supreme power in our system of government, and
19 every man who by accepting office participates in its functions
20 is only the more strongly bound to submit to that supremacy, and
21 to observe the limitations which it imposes upon the exercise of
22 the authority which it gives."); U.S. v. Nixon, 418 U.S. 683,
23 695-96 (1974) (rule of law is "historic commitment"); Accardi v.
24 O'Shaughnessv, 347 U.S. 260, 267-68 (1954) (Attorney General must
25 abide by regulations and cannot dictate immigration board's
26 exercise of discretion in decision on application to suspend

7

1 | deportation; remedy is new hearing where board will exercise it's
2 | discretion free from bias).

3 | Concomitant to the guarantee against arbitrary and
4 | capricious state action is the right to a fact-finder who has not
5 | predetermined the outcome of a hearing. See Withrow v. Larkin,
6 | 421 U.S. 35 (1975) (a fair trial in a fair tribunal is a basic
7 | requirement of due process, and this rule applies to
8 | administrative agencies which adjudicate as well as to courts);
9 | Edwards v. Balisok, 520 U.S. 641 (1997) (recognizing due process
10 | claim based on allegations that prison disciplinary hearing
11 | officer was biased and would suppress evidence of innocence);
12 | Bakalis v. Golembeski, 35 F.3d 318, 326 (7th Cir. 1994) (a
13 | decision-making body "that has prejudged the outcome cannot
14 | render a decision that comports with due process").

15 | Courts too numerous to list have recognized that the right
16 | to a disinterested decision-maker, who has not prejudged the
17 | case, is part of the fundamental guarantee against arbitrary and
18 | capricious government conduct in the California parole context.
19 | See, e.g., Rosenkrantz, 29 Cal. 4th at 677 (parole decision "must
20 | reflect an individualized consideration of the specified criteria
21 | and cannot be arbitrary and capricious"); In re Ramirez, 94 Cal.
22 | App. 4th 549, 563 (2001) ("some evidence" standard is "only one
23 | aspect of judicial review for compliance with minimum standards
24 | of due process" (citing Balisok) and Board violates due process
25 | if its decision is "arbitrary and capricious"); In re Minnis, 7
26 | Cal. 3d 639 (1972) (blanket no-parole policy as to certain

8

1  category of prisoners is illegal); In re Morrall, 102 Cal. App.
2  4th 280 (2003) (same). The guarantee of neutral parole officials
3  in a suitability hearing is just as fundamental as the right to a
4  neutral judge in a court proceeding. Compare Sellars v.
5  Procunier, 641 F.2d 1295 (9th Cir. 1981) (holding that California
6  parole officials, analogous to judges, are entitled to absolute
7  immunity).

8      The Ninth Circuit previously has acknowledged California
9  inmates' due process right to parole consideration by neutral
10 decision-makers. See O'Bremski v. Maas, 915 F.2d 418, 422 (9th
11 Cir. 1990). In that case the appellate court found that a
12 neutral parole panel at a new hearing would reach the same
13 outcome and so denied relief. The record in this case simply
14 will not permit the same conclusion. The requirement of an
15 impartial decision-maker transcends concern for diminishing the
16 likelihood of error. As the Supreme Court clearly held in
17 Balisok a decision made by a fact-finder who has predetermined
18 the outcome is per se invalid -- even where there is ample
19 evidence to support it. 520 U.S. at 648.

20     Petitioner presents a convincing case that a blanket policy
21 against parole for murderers prevented him from obtaining a
22 parole suitability determination made after a fair hearing.
23 Respondent offers nothing to counter petitioner's showing.

24     Accordingly, the court hereby recommends that the petition
25 for habeas corpus be granted unless, within 60 days of the
26 district court's adoption of these recommendations, respondent

9

1  provides a fair parole suitability hearing, conducted by a board
2  free of any prejudice stemming from a gubernatorial policy
3  against parole for murderers.

4       Pursuant to the provisions of 28 U.S.C. § 636(b)(1), these
5  findings and recommendations are submitted to the United States
6  District Judge assigned to this case.  Within 20 days after being
7  served with these findings and recommendations, respondent may
8  file written objections.  The document should be captioned
9  "Objections to Magistrate Judge's Findings and Recommendations."
10 The district judge may accept, reject, or modify these findings
11 and recommendations in whole or in part.

12      Dated:  DEC 2 1 2004    .

13
14                                         Peter A. Nowinski
                                           Magistrate Judge
15
16
17
18
19
20
21
22
23
24
25
26  cole0783.f&r grant

                              10

bd

United States District Court
for the
Eastern District of California
December 22, 2004

\* \* CERTIFICATE OF SERVICE \* \*

2:96-cv-00783

Coleman

v.

Board of Prison Term

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on  December 22, 2004, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office, or, pursuant to prior
authorization by counsel, via facsimile.

        Tami M Warwick                              TM/PAN
        Attorney General's Office for the State of California
        PO Box 944255                               AR/LKK
        1300 I Street
        Suite 125
        Sacramento, CA  94244-2550

        Ann Catherine McClintock
        Federal Defender
        801 I Street
        Third Floor
        Sacramento, CA  95814

                                    Jack L. Wagner, Clerk

                                BY:
                                    Deputy Clerk

EXHIBIT 9



1

2

3    SUPERIOR COURT OF CALIFORNIA

4         COUNTY OF SANTA CLARA

5

6

7    In re                           )    No.: 71614
                                      )
8         ARTHUR CRISCIONE,           )
                                      )    ORDER
9    On Habeas Corpus                 )
                                      )

10

11

12                    INTRODUCTION

13        Petitioner alleges that he has been denied due process of law

14   because the Board has used standards and criteria which are

15   unconstitutionally vague in order to find him unsuitable for parole.

16   Alternatively, he argues that those standards, even if

17   constitutionally sound, are nonetheless being applied in an arbitrary

18   and meaningless fashion by the Board.  He relies upon evidence that

19   in one hundred percent of 2690 randomly chosen cases, the Board found

20   the commitment offense to be "especially heinous, atrocious or

21   cruel", a factor tending to show unsuitability under Title 15

22   §2402(c)(1).

23        **Are the Board Criteria Unconstitutionally Vague?**

24        Our courts have long recognized that both state and federal due

25   process requirements dictate that the Board must apply detailed

26   standards when evaluating whether an individual inmate is unsuitable

27   for parole on public safety grounds.  (See *In re Dannenberg* (2005) 14

28

                                  1.

1  Cal.4th 1061 at p. 1096, footnote 16.) Those standards are found in

2  15 CCR §2402(c) (*Dannenberg, supra,* 34 Cal.4th at p. 1080,) and do

3  include detailed criteria to be applied by the Board when considering

4  the commitment offense:

5      (c) Circumstances Tending to Show Unsuitability. The following
       circumstances each tend to indicate unsuitability for release.

6      These circumstances are set forth as general guidelines; the
       importance attached to any circumstance or combination of

7      circumstances in a particular case is left to the judgment of
       the panel. Circumstances tending to indicate unsuitability

8      include:

9      (1) Commitment Offense. The prisoner committed the offense in an
       especially heinous, atrocious or cruel manner. The factors to be

10     considered include:

11         (A) Multiple victims were attacked, injured or killed in
           the same or separate incidents.

12
           (B) The offense was carried out in a dispassionate and
13         calculated manner, such as an execution-style murder.

14         (C) The victim was abused, defiled or mutilated during or
           after the offense.

15
           (D) The offense was carried out in a manner which
16         demonstrates an exceptionally callous disregard for human
           suffering.

17
           (E) The motive for the crime is inexplicable or very
18         trivial in relation to the offense.

19
       In response to Petitioners claim that the regulations are
20
   impermissibly vague, Respondent argues that while "especially
21
   heinous, atrocious or cruel" might be vague in the abstract it is
22
   limited by factors (A)-(E) of §2402(c)(1), and thus provides a
23
   'principled basis' for distinguishing between those cases which are
24
   contemplated in that section and those which are not.  An examination
25
   of cases involving vagueness challenges to death penalty statutes is
26
   instructive here and shows that Respondent's position has merit:
27
       "Our precedents make clear that a State's capital sentencing
28

2

1      scheme also must genuinely narrow the class of persons eligible
       for the death penalty.  When the purpose of a statutory
2      aggravating circumstance is to enable the sentencer to
       distinguish those who deserve capital punishment from those who
3      do not, the circumstance must provide a principled basis for
       doing so.  If the sentencer fairly could conclude that an
4      aggravating circumstance applies to every defendant eligible for
       the death penalty, the circumstance is constitutionally infirm."
5         (Arave v. Creech (1993) 507 U.S. 463, 474, citing Maynard v.
       Cartwright (1988) 486 U.S. 356, 364: "invalidating aggravating
6      circumstance that 'an ordinary person could honestly believe'
       described every murder," and, Godfrey v. Georgia (1980) 446 U.S.
7      420, 428-429: "A person of ordinary sensibility could fairly
       characterize almost every murder as 'outrageously or wantonly
8      vile, horrible and inhuman.'")

9
        It cannot fairly be said that 'every murder' could be
10
   categorized as "especially heinous, atrocious or cruel" under the
11
   Board regulations, since the defining factors contained in
12
   subdivisions (A)-(E) clearly narrow the group of cases to which it
13
   applies.  Although Petitioner also argues that the "vague statutory
14
   language is not rendered more precise by defining it in terms or
15
   synonyms of equal or greater uncertainty" (People v. Superior Court
16
   (Engert) (1982) 31 Cal.3d 797, 803, Pryor v. Municipal Court (1979)
17
   25 Cal.3d 238, 249. See also Walton v. Arizona (1990) 497 U.S. 639,
18
   654), the factors in those subdivisions are not themselves vague or
19
   uncertain.  The mere fact that there may be some subjective component
20
   (such as "exceptionally callous" disregard for human suffering) does
21
   not render that factor unconstitutionally vague.   The proper degree
22
   of definition of such factors is not susceptible of mathematical
23
   precision, but will be constitutionally sufficient if it gives
24
   meaningful guidance to the Board.
25
        A law is void for vagueness if it "fails to provide adequate
26        notice to those who must observe its strictures and
          impermissibly delegates basic policy matters to policemen,
27        judges, and juries for resolution on an ad hoc and subjective
          basis, with the attendant dangers of arbitrary and
28

                                    3

 
discriminatory application."   *(People v. Rubalcava* (2000) 23
Cal.4th 322, 332, quoting *People ex rel. Gallo v. Acuna* (1997)
14 Cal. 4th 1090, 1116, quoting *Grayned v. City of Rockford*
(1972) 408 U.S. 104, 108-109.)

A review of cases expressing approval of definitions to limit the
application of otherwise vague terms in death penalty statutes leads
inextricably to the conclusion that the limiting factors in §2402(c)
easily pass constitutional muster.  An Arizona statute was upheld
that provided a crime is committed in an 'especially cruel manner'
when the perpetrator inflicts mental anguish or physical abuse before
the victim's death," and that "mental anguish includes a victim's
uncertainty as to his ultimate fate."  *(Walton v. Arizona* (1990) 497
U.S. 639, 654.)  Similarly, the court in *Maynard v. Cartwright*, 486
U.S. at 364-365, approved a definition that would limit Oklahoma's
"especially heinous, atrocious, or cruel" aggravating circumstance to
murders involving "some kind of torture or physical abuse.  In
Florida, the statute authorizing the death penalty if the crime is
"especially heinous, atrocious, or cruel," satisfied due process
concerns where it was further defined as "the conscienceless or
pitiless crime which is unnecessarily torturous to the victim."
*State v. Dixon* (1973) 283 So. 2d 1 at p. 9.

Here, the factors in subdivisions (A)-(E) provide equally clear
limiting construction to the term "especially heinous, atrocious, or
cruel" in §2402(c).

### Has the Board Engaged in a Pattern of Arbitrary Application of the Criteria?

As previously noted, 15 CCR §2402 provides detailed criteria for
determining whether a crime is "exceptionally heinous, atrocious or
cruel" such that it tends to indicate unsuitability for parole.  Our

4

1   courts have held that to fit within those criteria and thus serve as

2   a basis for a finding of unsuitability, the circumstances of the

3   crime must be more aggravated or violent than the minimum necessary

4   to sustain a conviction for that offense.   (In re Rosenkrantz (2002)

5   29 Cal.4th 616, 682-683.)  Where that is the case, the nature of the

6   prisoner's offense, alone, can constitute a sufficient basis for

7   denying parole.   (In re Dannenberg, supra, 34 Cal.4th at p. 1095.)

8       Petitioner claims that those criteria, even if constitutionally

9   sound, have been applied by the Board in an arbitrary and capricious

10  manner rendering them devoid of any meaning whatever.  The role of

11  the reviewing court under these circumstances has been addressed

12  previously in the specific context of Parole Board actions:

13      "[Courts have] an obligation, however, to look beyond the facial
        validity of a statute that is subject to possible
14      unconstitutional administration since a law though fair on its
        face and impartial in appearance may be open to serious abuses
15      in administration and courts may be imposed upon if the
        substantial rights of the persons charged are not adequately
16      safeguarded at every stage of the proceedings.  We have
        recognized that this court's obligation to oversee the execution
17      of the penal laws of California extends not only to judicial
        proceedings, but also to the administration of the Indeterminate
18      Sentence Law."  (In re Rodriguez (1975) 14 Cal.3d 639, 648,
        quoting Minnesota v. Probate Court (1940) 309 U.S. 270, 277.)

19

20      Similarly, in In re Minnis (1972) 7 Cal.3d 639, 645, the case

21  closest on point to the present situation, the California Supreme

22  Court stated: "This court has traditionally accepted its

23  responsibility to prevent an authority vested with discretion from

24  implementing a policy which would defeat the legislative motive for

25  enacting a system of laws."   Where, as here, the question is whether

26  determinations are being made in a manner that is arbitrary and

27  capricious, judicial oversight "must be extensive enough to protect

28

-5-

1  limited right of parole applicants 'to be free from an arbitrary
2  parole decision... and to something more than mere pro-forma
3  consideration.'"  (In re Ramirez (2001) 94 Cal.App.4th 549 at p. 564,
4  quoting In re Sturm (1974) 11 Cal.3d 258 at p. 268.)

5      This Court, therefore, now examines Petitioner's "as applied"
:6  void for vagueness challenge.

7

8                        The Evidence Presented

9      A similar claim to those raised here, involving allegations of
10  abuse of discretion by the Board in making parole decisions, was
11  presented to the Court of Appeal in In re Ramirez, supra.  The court
12  there observed that such a "serious claim of abuse of discretion"
13  must be "adequately supported with evidence" which should be
14  "comprehensive."  (Ramirez, supra, 94 Cal.App.4th at p. 564, fn. 5.)
15  The claim was rejected in that case because there was not "a
16  sufficient record to evaluate."  (Ibid.)  In these cases, however,
17  there is comprehensive evidence offered in support of Petitioner's
18  claims.

19     Discovery orders were issued in five different cases involving
20  life term inmates (Petitioners) who all presented identical claims.[1]

21

22  [1] This Court takes judicial notice of the several other cases currently
    pending (Lewis #68038, Jameison #71194, Bragg #108543, Ngo #127611.) which
23  raise this same issue and in which proof was presented on this same point.
    (Evidence Code § 452(d).  See specifically, in the habeas corpus context,
24  In re Vargus (2000) 83 Cal.App.4th 1125, 1134-1136, 1143, in which judicial
    notice was taken of the evidence in four other cases and in which the court
25  noted: "Facts from other cases may assist petitioner in establishing a
    pattern."  See generally McKell v. Washington Mutual, Inc. (2006) 142
26  Cal.App.4th 1457, 1491: "trial and appellate courts ... may properly take
    judicial notice of ... established facts from both the same case and other
27  cases."  And see AB Group v. Wertin (1997) 59 Cal.App.4th 1022, 1036:
    Judicial notice taken of other cases when matters are "just as relevant to
28  the present [case] as they are to the others.")

                                    6

1  The purpose of the discovery was to bring before the Court a
2  comprehensive compilation and examination of Board decisions in a
3  statistically significant number of cases.  The Board decisions under
4  examination consisted of final decisions of the Board for life-term
5  inmates convicted of first or second degree murder and presently
6  eligible for parole.  Included were all such decisions issued in
7  certain months, chosen by virtue of their proximity in time to the
8  parole denials challenged in the pending petitions.  All Board
9  decisions in the months of August, September and October of 2002,
10  July, August, September, October, November, and December of 2003,
11  January and February of 2004, February of 2005, and January of 2006
12  were compiled.  This resulted in a review of 2690 cases decided in a
13  total of 13 months.

14      The purpose of the review was to determine how many inmates had
15  actually been denied parole based in whole or in part on the Board's
16  finding that their commitment offense fits the criteria set forth in
17  Title 15 §2402(c)(1) as "especially heinous, atrocious or cruel."  A
18  member of the research team conducting the review, Karen Rega,
19  testified that in its decisions the Board does not actually cite CCR
20  rule §2402(c), but consistently uses the specific words or phrases
21  ("verbiage from code") contained therein, so that it could easily be
22  determined when that criteria was being applied.  (For example,
23  finding "multiple victims" invokes §2402(c)(1)(A); finding the crime
24  "dispassionate" "calculated" or "execution style" invokes
25  §2402(c)(1)(B); that a victim was "abused" "mutilated" or "defiled"
26  invokes §2402(c)(1)(C);  a crime that is "exceptionally callous" or
27  demonstrated a "disregard for human suffering" fits criteria
28

7

1  §2402(c)(1)(D); and finding the motive for the crime "inexplicable"
2  or "trivial" invokes §2402(c)(1)(E).)

3      Petitioners provided charts, summaries, declarations, and the
4  raw data establishing the above in the cases of Lewis #68038,
5  Jameison #71194, Bragg #109543, and Ngo #127611.  In this case
6  (Criscione #71614) the evidence was presented somewhat differently.
7  Both to spread the burden of the exhaustive examination, and to
8  provide a check on Petitioners' methods, this Court ordered
9  Respondent to undertake an examination of two randomly chosen months
10  in the same manner as Petitioner had been doing.  Respondent complied
11  and provided periodic updates in which they continued to report that
12  at all "the relevant hearings the Board relied on the commitment
13  offense as a basis for denying parole."  (See "Respondent's Final
14  Discovery Update" filed April 5, 2007.)  At the evidentiary hearing
15  on this matter counsel for Respondents stipulated that "in all of
16  those cases examined [by Respondent pursuant to the Criscione
17  discovery orders] the Board relied on the commitment offense as a
18  basis for denying parole."  (See pages 34-35 of the June 1, 2007,
19  evidentiary hearing transcript.)

20      The result of the initial examination was that in over 90
21  percent of cases the Board had found the commitment offense to be
22  "especially heinous, atrocious or cruel" as set forth in Title 15
23  §2402(c)(1).  In the remaining 10% of cases either parole had been
24  granted, or it was unclear whether §2402(c)(1) was a reason for the
25  parole denial.  For all such cases, the decisions in the prior
26  hearing for the inmate were obtained and examined.  In every case,
27  the Board had determined at some point in time that every inmates
28

8

1  crime was "especially heinous, atrocious or cruel" under Title 15

2  §2402(c)(1).

3      Thus, it was shown that 100% of commitment offenses reviewed by

4  the Board during the 13 months under examination were found to be

5  "especially heinous, atrocious or cruel" under Title 15 §2402(c)(1).

6      A further statistic of significance in this case is that there

7  are only 9,750 inmates total who are eligible for, and who are

8  currently receiving, parole consideration hearings as life term

9  inmates.  (See "Respondent's Evidentiary Hearing Brief," at p. 4,

10  filed April 16, 2007.)

11

12                      USE OF STATISTICS

13      In *International Brotherhood of Teamsters v. United States*

14  (1977) 431 U.S. 324, 338-340, the United States Supreme Court

15  reaffirmed that statistical evidence, of sufficient "proportions,"

16  can be sound and compelling proof.  As noted by the court in *Everett*

17  *v. Superior Court* (2002) 104 Cal.App.4th 388, 393, and the cases cited

18  therein, "courts regularly have employed statistics to support an

19  inference of intentional discrimination."

20      More recently, the United States Supreme Court, in *Miller-El v.*

21  *Cockrell* (2003) 537 U.S. 322, 154 L.Ed.2d 931, when examining a habeas

22  petitioner's allegations that the prosecutor was illegally using his

23  peremptory challenges to exclude African-Americans from the

24  petitioner's jury, noted that "the statistical evidence alone" was

25  compelling.  The high court analyzed the numbers and concluded:

26  "Happenstance is unlikely to produce this disparity."  (See also

27  *People v. Hofsheier* (2004) 117 Cal.App.4th 438 in which "statistical

28

9

1  evidence" was noted as possibly being dispositive.  And see *People v.*
2  *Flores* (2006) 144 Cal.App.4th 625 in which a statistical survey and
3  analysis, combined into an "actuarial instrument" was substantial
4  proof.)

5      A statistical compilation and examination such as has been
6  presented in these cases is entirely appropriate and sufficient
7  evidence from which to draw sound conclusions about the Board's
8  overall methods and practices.

9

10                    **THE EXPERT'S TESTIMONY**

11      Petitioners provided expert testimony from Professor Mohammad
12  Kafai regarding the statistics and the conclusions that necessarily
13  follow from them.  Professor Kafai is the director of the statistics
14  program at San Francisco State University, he personally teaches
15  statistics and probabilities, and it was undisputed that he was
16  qualified to give the expert testimony that he did.  No evidence was
17  presented that conflicts or contradicts the testimony and conclusions
18  of Professor Kafai.  By stipulation of the parties, Professor Kafai's
19  testimony was to be admissible and considered in the cases of all
20  five petitioners.  (See page 35 of the June 1, 2007, evidentiary
21  hearing transcript.)

22      Professor Kafai testified that the samples in each case, which
23  consisted of two or three months of Board decisions, are
24  statistically sufficient to draw conclusions about the entire
25  population of life term inmates currently facing parole eligibility
26  hearings.  Given that every inmate within the statistically
27  significant samples had his or her crime labeled "'particularly
28

10



1  egregious'" or "especially heinous, atrocious or cruel" under Title
2  15 §2402(c)(1), it can be mathematically concluded that the same
3  finding has been made for every inmate in the entire population of
4  9,750.  Although he testified that statisticians never like to state
5  unequivocally that something is proven to a 100% certainty, (because
6  unforeseen anomalies are always theoretically possible,) he did
7  indicate the evidence he had thus far examined came as close to that
8  conclusion as could be allowed.  Not surprisingly, Professor Kafai
9  also testified that "more than 50% can't by definition constitute an
10  exception."

11      Having found the data provided to the expert to be sound this
12  Court also finds the expert's conclusions to be sound.  In each of
13  the five cases before the Court over 400 inmates were randomly chosen
14  for examination.  That number was statistically significant and was
15  enough for the expert to draw conclusions about the entire population
16  of 9,750 parole eligible inmates.  The fact that the approximately
17  2000 inmates examined in the other cases also had their parole denied
18  based entirely or in part on the crime itself (§2402(c)(1)), both
19  corroborates and validates the expert's conclusion in each individual
20  case and also provides an overwhelming and irrefutable sample size
21  from which even a non expert can confidently draw conclusions.

22

23                            DISCUSSION

24      Although the evidence establishes that the Board frequently says
25  parole is denied "first," "foremost," "primarily," or "mainly,"
26  because of the commitment offense, this statement of primacy or
27  weight is not relevant to the question now before the Court.
28

                                11



1  Petitioners acknowledge that the Board generally also cites other

2  reasons for its decision. The question before this Court, however,

3  is not whether the commitment offense is the primary or sole reason

4  why parole is denied -- the question is whether the commitment

5  offense is labeled "'particularly egregious'" and thus could be used,

6  under *Dannenberg,* primarily or exclusively to deny parole.

7       The evidence proves that in a relevant and statistically

8  significant period where the Board has considered life term offenses

9  in the context of a parole suitability determination, every such

10  offense has been found to be "particularly egregious" or "especially

11  heinous, atrocious or cruel."[2]  This evidence conclusively

12  demonstrates that the Board completely disregards the detailed

13  standards and criteria of §2402(c). "Especially" means particularly,

14  or "to a distinctly greater extent or degree than is common."[3]  (EC §

15  451(e).)  By simple definition the term "especially" as contained in

16  section 2402(C)(1) cannot possibly apply in 100% of cases, yet that

17  is precisely how it has been applied by the Board.  As pointed out by

18  the Second District Court of Appeal, not every murder can be found to

19  be "atrocious, heinous, or callous" or the equivalent without "doing

20

21  [2] In a single case out of the 2690 that were examined Petitioner has conceded that
    the Board did not invoke §2402(c)(1). This Court finds that concession to be
    improvidently made and the result of over caution. When announcing the decision at
22  the initial hearing of S. Fletcher (H-10330) on 4/6/06, the commissioner did begin
    by stating "I don't believe this offense is particularly aggravated..." However
    the commissioner proceeds to describe the crime as a drug deal to which Fletcher
23  brought a gun so "we could say there was some measure of calculation in that." The
    commissioner continued by observing that the reason someone would bring a gun to a
    drug transaction was to make sure things went according to their plan "so I guess
24  we can say that that represents calculation and perhaps it's aggravated to that
    extent." As is the Board's standard practice, by using the word 'calculated' from
25  §2402(c)(1)(b) the Board was invoking that regulation. Certainly if Mr. Fletcher
    had brought a habeas petition Respondent's position would be that there is "some
26  evidence' supporting this. The ambiguity created by the commissioner's initial
    statement was cleared up several pages later when he announces that "based upon the
    crime coupled with ..." parole was denied for four years. (See *In re Burns* (2006)
27  136 Cal.App.4th 1318, 1326, holding §2402(c)(1) criteria are necessary for a multi-
    year denial.)

28

12

1  violence" to the requirements of due process.  (*In re Lawrence* (2007)
2  150 Cal.App.4th 1511, 1557.)  This is precisely what has occurred
3  here, where the evidence shows that the determinations of the Board
4  in this regard are made not on the basis of detailed guidelines and
5  individualized consideration, but rather through the use of all
6  encompassing catch phrases gleaned from the regulations.

7

8                          **THE BOARD'S METHODS**

9      Because it makes no effort to distinguish the applicability of
10  the criteria between one case and another, the Board is able to force
11  every case of murder into one or more of the categories contained in
12  §2402(c).

13      For example, if the inmate's actions result in an instant death
14  the Board finds that it was done in a "dispassionate and calculated
15  manner, such as an execution-style murder."  At the same time the
16  Board finds that a murder not resulting in near instant death shows a
17  "callous disregard for human suffering" without any further analysis
18  or articulation of facts which justify that conclusion.  If a knife
19  or blunt object was used, the victim was "abused, defiled, or
20  mutilated."  If a gun was used the murder was performed in a
21  "dispassionate and calculated manner, such as an execution-style
22  murder."  If bare hands were used to extinguish another human life
23  then the crime is "particularly heinous and atrocious."

24      Similarly, if several acts, spanning some amount of time, were
25  necessary for the murder the Board may deny parole because the inmate
26  had "opportunities to stop" but did not.  However if the murder was
27  _____
    [3] Princeton University World Net Dictionary (2006).
28

                                13



1 | accomplished quickly parole will be denied because it was done in a
2 | dispassionate and calculated manner and the victim never had a chance
3 | to defend themselves or flee.  If the crime occurred in public, or
4 | with other people in the vicinity, it has been said that the inmate
5 | "showed a callous disregard" or "lack of respect" for the
6 | "community."  However if the crime occurs when the victim is found
7 | alone it could be said that the inmate's actions were aggravated
8 | because the victim was isolated and more vulnerable.

9 | In this manner, under the Board's cursory approach, every murder
10 | has been found to fit within the unsuitability criteria.  What this
11 | reduces to is nothing less than a denial of parole for the very
12 | reason the inmates are present before the Board - i.e, they committed
13 | murder.  It is circular reasoning, or in fact no reasoning at all,
14 | for the Board to begin each hearing by stating the inmate is before
15 | them for parole consideration, having passed the minimum eligible
16 | parole date based on a murder conviction, and for the Board to then
17 | conclude that parole will be denied because the inmate committed acts
18 | that amount to nothing more than the minimum necessary to convict
19 | them of that crime.  As stated quite plainly by the Sixth District:
20 | "A conviction for murder does not automatically render one unsuitable
21 | for parole."  (Smith, supra, 114 Cal.App.4th at p. 366, citing
22 | Rosenkrantz, supra, 29 Cal.4th at p. 683.)

23 | In summary, when every single inmate is denied parole because
24 | his or her crime qualifies as a §2402(c)(1) exception to the rule
25 | that a parole date shall normally be set, then the exception has
26 | clearly swallowed the rule and the rule is being illegally
27 | interpreted and applied.  When every single life crime that the Board
28 |

14

1  examines is "particularly egregious" and "especially heinous,

2  atrocious or cruel" it is obvious that the Board is operating without

3  any limits and with unfettered discretion.

4       Other examples of the failure to 'connect up' the facts of the

5  individual case with the criteria and the ultimate findings abound in

6  the decisions of the reviewing courts.  Some of the state cases to

7  have reversed Parole Board or Governor abuses of discretion in

8  denying parole include *In re Roderick, In re Cooper, In re Lawrence,*

9  *In re Barker, In re Gray, In re Lee, In re Elkins, In re Weider, In*

10  *re Scott, In re Deluna, In re Ernest Smith, In re Mark Smith,* and *In*

11  *re Capistran.*

12       When "the record provides no reasonable grounds to reject, or

13  even challenge, the findings and conclusions of the psychologist and

14  counselor concerning [the inmate's] dangerousness" the Board may not

15  do so.  (*In re Smith* (2003) 114 Cal.App.4th 343, 369.)

16       When an inmate, although only convicted of a second degree

17  murder, has been incarcerated for such time that, with custody

18  credits, he would have reached his MEPD if he had been convicted of a

19  first, the Board must point to evidence that his crime was aggravated

20  or exceptional even for a first degree murder if they are going to

21  use the crime as a basis for denying parole.  (*In re Weider* (2006)

22  145 Cal.App.4th 570, 582-583.)[4]

23

24  [4]    This rule, rooted in Justice Moreno's concurrence in *Rosenkrantz, supra,* is
     particularly applicable in this case. Petitioner was convicted of second degree,
25   but acquitted of first degree, murder over 25 years ago.  (*People v. Criscione*
     (1981) 125 Cal.App.3d 275.)  With his custody credits he is beyond the matrix even
26   had he been convicted of a first.  In a currently pending habeas petition in which
     he challenges his 2007 parole denial the first reason the Board gave was the crime
27   itself and the presiding commissioner explained; "His actions go well beyond the
     minimum necessary for a conviction of murder in the second degree."  (Decision page
     2 of 4/2/07 transcript.)  For the Board to penalize the Petitioner for the fact
28   that he was acquitted of first degree is further proof of their willfulness and

15

1    A "petitioner's young age at the time of the offense" must be
2  considered.  (In re Elkins (2006) 144 Cal.App.4th 475, 500, quoting
3  Rosenkrantz v. Marshall (C.D.Cal. 2006) 444 F. Supp. 2d 1063, 1065,
4  1085: "The reliability of the facts of the crime as a predictor for
5  his dangerousness was diminished further by his young age of 18, just
6  barely an adult. 'The susceptibility of juveniles to immature and
7  irresponsible behavior means their irresponsible conduct is not as
8  morally reprehensible as that of an adult.'")[5]

9    The Board's formulaic practice of stating §2402(c)(1) phrased in
10 a conclusory fashion, and then stating "this is derived from the
11 facts" without ever linking the two together, is insufficient.  (In
12 re Roderick, (2007) ___ Cal.App.4th ___ (A113370): "At minimum, the
13 Board is responsible for articulating the grounds for its findings
14 and for citing to evidence supporting those grounds." (See also In
15 re Barker (2007) 151 Cal.App.4th 346, 371, disapproving
16 "conclusorily" announced findings.)

17    After two decades, mundane "crimes have little, if any,
18 predictive value for future criminality.  Simply from the passing of
19 time, [an inmate's] crimes almost 20 years ago have lost much of
20 their usefulness in foreseeing the likelihood of future offenses than
21 if he had committed them five or ten years ago."  (In re Lee (2006)
22 143 Cal.App.4th 1400, 1412.)  It should be noted that this rule

23
   bias.  The jury had a reasonable doubt that Petitioner committed first degree
24 murder but under the Board's 'reasoning' and 'analysis' this puts him in a worse
   position than if they had not.  Had the jury convicted him of the greater offense
25 Petitioner has served so much time that he would already be having subsequent
   parole hearings on a first and the Board would not have been able to use the 'some
   evidence' of first degree behavior against him.  As observed previously, the
26 Board's position in this regard is "so ridiculous that simply to state it is to
   refute it."  (Weider, supra, 145 Cal.App.4th at p. 583.)
   [5] This point is particularly significant in the case of Mike Ngo.  Mr. Ngo was only
27 18 at the time of his crime.  The impetus behind the shooting was youth group or

28

                                16

1  applies with even more force when the Board is relying on any
2  criminality that occurred before the crime.  In that situation, just
3  as with the crime itself, the Board must explain why such old events
4  have any relevance and especially when the inmate has spent a decade
5  as a model prisoner.

6       Murders situationally related to intimate relationships are
7  unfortunately commonplace because emotions are strongest in such
8  domestic settings.  When a murder occurs because of "stress unlikely
9  to be reproduced in the future" this is a factor that affirmatively
10 points towards suitability.  (In re Lawrence (2007) 150 Cal.App.4th
11 1511 and cases cited therein.)

12      "The evidence must substantiate the ultimate conclusion that the
13 prisoner's release currently poses an unreasonable risk of danger to
14 the public.  It violates a prisoner's right to due process when the
15 Board or Governor attaches significance to evidence that forewarns no
16 danger to the public."  (In re Tripp (2007) 150 Cal.App.4th 306,
17 313.)

18      The Board "cannot rely on the fact that the killing could have
19 been avoided to show the killing was especially brutal."  (In re
20 Cooper (2007) 153 Cal.App.4th 1043, 1064.)

21      The Board's focus must be upon how the inmate "actually
22 committed his crimes" not the "incorporeal realm of legal
23 constructs."  (Lee, supra, 143 Cal.App.4th at p. 1413.)  This is
24 especially significant when the murder conviction is based on the
25 felony murder rule, provocative act doctrine, or accomplice liability
26 such that the inmate did not intend to kill or may not have even been
27 _____
   gang rivalries, posturing, and threats which mature adults would not have been
28

                                17



1  the actual killer.

2      The Board has ample guidance before it in the decisions of the

3  various reviewing courts to constrain its abuse, but has failed to

4  avail itself of the opportunity to do so.

5

6                  SEPARATION OF POWERS DOCTRINE

7      The evidence presented, as discussed above, has established a

8  void for vagueness "as applied" due process violation.  That same

9  evidence also proves a separate but related Constitutional violation

10  -- an as applied separation of powers violation.

11      The separation of powers doctrine provides "that the legislative

12  power is the power to enact statutes, the executive power is the

13  power to execute or enforce statutes, and the judicial power is the

14  power to interpret statutes and to determine their

15  constitutionality."  (Lockyer v. City and County of San Francisco

16  (2004) 33 Cal.4th 1055, 1068.)  Because the evidence has proven the

17  Board is not executing/enforcing the legislature's statutes as

18  intended it is this Court's duty to intervene.  The question here is

19  whether the Board is violating the separation of powers doctrine by

20  appropriating to itself absolute power over parole matters and

21  disregarding the limits and guidelines placed by the statute.[6]

22      "Government Code section 11342.2 provides: 'Whenever by the

23

24  caught up in.
    [6] "It is settled that Administrative regulations that violate acts of the
25  Legislature are void and no protestations that they are merely an exercise of
    administrative discretion can sanctify them.  They must conform to the legislative
26  will if we are to preserve an orderly system of government.  Nor is the motivation
    of the agency relevant: It is fundamental that an administrative agency may not
27  usurp the legislative function, no matter how altruistic its motives are."
    (Agricultural Labor Relations Board v. Superior Court of Tulare County (1976) 16
28  Cal.3d 392, 419 quoting Morris v. Williams (1967) 67 Cal.2d 733, 737, and City of
    San Joaquin v. State Bd. of Equalization (1970) 9 Cal.App.3d 365, 374.)

                                18

1  express or implied terms of any statute a state agency has authority
2  to adopt regulations to implement, interpret, make specific or
3  otherwise carry out the provisions of the statute, no regulation
4  adopted is valid or effective unless consistent and not in conflict
5  with the statute and reasonably necessary to effectuate the purpose
6  of the statute.'  Administrative regulations that alter or amend the
7  statute or enlarge or impair its scope are void and courts not only
8  may, but it is their obligation to strike down such regulations."
9  (*Pulaski v. Occupational Safety & Health Stds. Bd.* (1999) 75
10 Cal.App.4th 1315, 1341, citations omitted.)

11     The vice of overbroad and vague regulations such as are at issue
12 here is that they can be manipulated, or 'interpreted,' by executive
13 agencies as a source of unfettered discretion to apply the law
14 without regard to the intend of the people as expressed by the
15 legislature's enabling statutes.  In short, agencies usurp unlimited
16 authority from vague regulations and become super-legislatures that
17 are unaccountable to the people.  As it has sometimes been framed and
18 addressed in the case law, a vague or all encompassing standard runs
19 the risk of "violat[ing] the separation of powers doctrine by
20 'transforming every [executive decisionmaker] into a "mini-
21 legislature" with the power to determine on an ad hoc basis what
22 types of behavior [satisfy their jurisdiction].'" (*People v. Ellison*
23 (1998) 68 Cal.App.4th 203, 211, quoting *People v. Superior Court*
24 *(Caswell)* (1988) 46 Cal.3d 381, 402.)

25     "It is concern about 'encroachment and aggrandizement,' the
26 [United States Supreme Court] reiterated, that has animated its
27 separation of powers jurisprudence. 'Accordingly, we have not
28

19


1  hesitated to strike down provisions of law that either accrete to a
2  single Branch powers more appropriately diffused among separate
3  Branches or that undermine the authority and independence of one or
4  another coordinate Branch.'" (Kasler v. Lockyer (2000) 23 Cal.4th
5  472, 493, quoting Mistretta v. United States (1989) 488 U.S. 361,
6  382.)  This articulation of the principle speaks directly to the
7  situation at hand.  The Board, by its enactment and interpretation of
8  Title 15, §2402, has appropriated to itself absolute power over
9  'lifer' matters.  Overreaching beyond the letter and spirit of the
10  Penal Code provisions, Title 15, §2402(c)(1) has been interpreted by
11  the Board to supply the power to declare every crime enough to deny
12  parole forever.  The fact that Title 15, §2402, has been invoked in
13  every case, but then sometime later not invoked, tends to show either
14  completely arbitrary and capricious behavior or that unwritten
15  standards are what really determine outcomes.  In either event, all
16  pretenses of taking guidance from, or being limited by, the
17  legislature's statutes have been abandoned.  "[I]t is an elementary
18  proposition that statutes control administrative interpretations."
19  (Ohio Casualty Ins. Co. v. Garamendi (2006) 137 Cal.App.4th 64, 78.)
20  Title 15 §2402 as applied, however, has no controls or limitations.
21      The PC § 3041(b) exception to the rule can only be invoked when
22  the "gravity of the current convicted offense or offenses, or the
23  timing and gravity of current or past convicted offense or offenses,
24  is such that consideration of the public safety requires a more
25  lengthy period of incarceration for this individual."  The word
26  "gravity" is a directive for comparison just as "more lengthy"
27  indicates a deviation from the norm.  While Dannenberg held there
28

20

09/12/2007  11:00                                     PAGE  21/34

1  does not need to be intra case comparison for the purposes of term
2  uniformity or proportionality, there necessarily has to be some sort
3  of comparison for the purposes of adhering to the legislative mandate
4  that parole is available.  The Board employs no meaningful yardstick
5  in measuring parole suitability.  This is a violation of the
6  separation of powers doctrine.  (People v. Wright (1982) 30 Cal.3d
7  705, 712-713.  And see Terhune v. Superior Court (1998) 65
8  Cal.App.4th 864, 872-873.  Compare Whitman v. Am. Trucking Ass'ns
9  (2001) 531 U.S. 457, 472, describing a delegation challenge as
10 existing when the legislature fails to lay down "an intelligible
11 principle to which the person or body authorized to act is directed
12 to conform.")

13

14                          RESPONDENT'S POSITION

15      The Attorney General has suggested, without pointing to any
16 concrete examples, that it is possible that the Board, when invoking
17 the crime as a reason to deny parole, is not placing it within
18 §2402(c)(1) but instead using is as some sort of 'lesser factor'
19 which, only when combined with other unsuitability criteria, can
20 contribute to a valid parole denial.  The two problems with this
21 position are, first, there is no evidentiary support for this
22 assertion, and second, it would have no impact on the constitutional
23 infirmities outlined and proven above.

24      Even if Respondent had produced evidence that the Board was
25 utilizing the crime as a 'lesser factor' which needs others to fully
26 support a parole denial, the Board would then be admitting it was
27 denying parole, in part, for the very reason that the person is

28

77'd        18/8-055-005                           PHRING 0000E    810'1 10 10 dos

1   before the panel and eligible for parole in the first place - the
2   commitment offense. Respondent's argument suggests that a crime that
3   only qualified as the *Dannenberg* "minimum necessary" could still be
4   invoked as a reason for denying parole. Respondent argues that when
5   the crime is invoked 'not in the *Dannenberg* sense,' there must be
6   other reasons for the parole denial and the crime alone would not be
7   enough in this context. This position is inconsistent with the law
8   and fundamental logic.

9        A crime qualifies under *Dannenberg* when it is "particularly
10  egregious," or one where "no circumstances of the offense reasonably
11  could be considered more aggravated or violent than the minimum
12  necessary to sustain a conviction for that offense." (*Dannenberg*,
13  *supra*, 34 Cal.4th at pp. 1094-1095.) These are the only two choices.
14  If a crime consists of only the bare elements then it is not
15  aggravated and it cannot, in and of itself, serve as a basis for
16  parole denials once the inmate becomes eligible for parole. It is
17  the reason an inmate may be incarcerated initially for the equivalent
18  of 15 or 25 years, and then examined to determination rehabilitation
19  efforts when they come before the Board, but a crime that is no more
20  than the bare minimum cannot be factored into the equation pursuant
21  to PC § 3041(b) or any of the case law interpreting it.
22        In oral argument Respondent suggested a second way the
23  commitment offense can be used outside of §2402(c)(1). If for
24  example a crime had its roots in gang allegiances or rivalries and
25  the inmate continued to associate with gangs while incarcerated, then
26  an aspect of the crime, even if the crime otherwise consisted of no
27  more than the minimum elements, could be combined with other behavior
28

22

1  to support a parole denial.  Similarly, if a crime was rooted in an
2  inmate's then existing drug addiction, and the Board was to point to
3  a recent 115 involving drugs, the evidence that the inmate's drug
4  issues had not been resolved would justify a parole denial even if
5  the crime itself was not aggravated.  A finding that the inmate is
6  not suitable for release under these circumstances, however, is not
7  based on the facts of the commitment offense as tending to show
8  unsuitability.  It is based on the conclusion that can be drawn about
9  Petitioner's lack of rehabilitation or change since the offense, and
10 thus, his present dangerousness.

11      Respondent has not demonstrated any flaws in Petitioner's
12 methodology or analysis, nor provided any actual evidence of the
13 crime being invoked other than pursuant to §2402(c)(1).  Drawing
14 conclusions from the Board's direct statements, or its precise
15 recitations of the §2402(c)(1) language, logically indicates an
16 invocation of §2402(c)(1), and Respondent's suggestion otherwise is
17 insupportable.

18

19                      THE QUESTION OF BIAS

20      Because the issue has been squarely presented, and strenuously
21 argued by Petitioners, this Court is obligated to rule on the charge
22 that the Board's actions prove an overriding bias and deliberate
23 corruption of their lawful duties.

24      In the discrimination and bias case of *USPS Bd. of Governors v.*
25 *Aikens* (1983) 460 U.S. 711, the United States Supreme Court
26 acknowledged "there will seldom be 'eyewitness' testimony as to the
27 [] mental processes" of the allegedly biased decisionmaker.  Instead,
28

                                23

1 | an examination of other cases for trends or patterns can provide the
2 | necessary circumstantial evidence. (See *Aikens, supra,* at footnote
3 | 2.) Reaffirming that such circumstantial evidence will be sufficient
4 | the Court stated: "The law often obliges finders of fact to inquire
5 | into a person's state of mind. As Lord Justice Bowen said in
6 | treating this problem in an action for misrepresentation nearly a
7 | century ago, 'The state of a man's mind is as much a fact as the
8 | state of his digestion. It is true that it is very difficult to
9 | prove what the state of a man's mind at a particular time is, but if
10 | it can be ascertained it is as much a fact as anything else.'"
11 | (*Aikens,* at pp. 716-717, quoting *Edgington v. Fitzmaurice* (1885) 29
12 | Ch. Div. 459, 483.)[7]

13 |      The discovery in these cases was granted in part due to the
14 | Petitioners' prima facie showing of bias and the necessity that it be
15 | "adequately supported with evidence" if such evidence is available.
16 | (*Ramirez, supra,* 94 Cal.App.4th at p. 564, fn. 5. See also *Nasha v.*
17 | *City of Los Angeles* (2004) 125 Cal.App.4th 470, 483: "A party seeking
18 | to show bias or prejudice on the part of an administrative decision
19 | maker is required to prove the same 'with concrete facts.'" And see
20 | *State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674,
21 | 841: "The challenge to the fairness of the adjudicator must set forth
22 | concrete facts demonstrating bias or prejudice." See also *Hobson v.*

23 |

24 | [7] As occurred in *Aikens, supra,* and as suggested in prior orders of this Court,
Respondent should have provided direct evidence from the decisionmakers. While the
fact that a *Defendant* does not explain his or her actions cannot be held against
25 | him, (*Griffin v. California* (1965) 380 U.S. 609, *Doyle v. Ohio* (1976) 426 U.S.
610,) it is appropriate to give some weight to the consideration that the Board has
26 | failed to offer any direct evidence or explanation on its own behalf. While the
case of *Hornung v. Superior Court* (2000) 81 Cal.App.4th 1095 stands for the
proposition that *Petitioner* may not inquire into the Board members mental
27 | processes, Respondent is not precluded from offering such direct evidence if they
were able to testify as to their good faith and conscientious efforts.
28 |

24

1 | *Hansen* (1967) 269 F.Supp. 401, 502, the watershed Washington D.C.
2 | school desegregation case in which the court determined from a
3 | statistical and factual analysis that racial bias was influencing
4 | policy.)

5 | In the case of *People v. Adams* (2004) 115 Cal.App.4th 243, 255,
6 | a similar claim of biased decision making was asserted and it was
7 | rejected because, although the defendant clearly articulated it, "he
8 | has not demonstrated it. Therefore, he has failed to bear his burden
9 | of showing a constitutional violation as a demonstrable reality, not
10 | mere speculation." In the present cases Petitioners have provided
11 | overwhelming concrete evidence. It is difficult to believe that the
12 | Board's universal application of §2402(c)(1) has been an inadvertent
13 | mistake or oversight on their part. It is hard to credit the Board's
14 | position that it does not know its own patterns and practices reveal
15 | a complete lack of standards or constraints on their power.
16 | Respondent's protestations ring hollow, and it seems a statistical
17 | impossibility, that the Board's use of "detailed" criteria in such a
18 | fashion that they are rendered meaningless is a result of good faith
19 | efforts on their part. That *every* murder is "especially heinous,
20 | atrocious or cruel," and can therefore be an exception to the rule
21 | that a parole date should be set, does not seem to be an accident on
22 | their part.

23 | Although no court has thus far agreed with the accusation that
24 | the Board approaches its duties with a predetermination and a bias,
25 | no court has previously been presented the comprehensive evidence
26 | outlined herein. While this Court does not turn a blind eye to the
27 | reasonable conclusion that the Board's unconstitutional practices are
28 |

25

09/12/2007  11:00

1  willful, there is another possibility.  The pattern of errors
2  demonstrated by the discovery in this case, and the continuously
3  growing body of Court of Appeal opinions finding consistent and
4  persistent abuse of discretion, may instead be caused by the fact
5  that the Board is simply overworked and substantively untrained.  The
6  impossibility of the blanket applicability of §2402(c)(1) may be only
7  the result of sloppy preparation and inadvertent carelessness.

8       The Board must first be given an opportunity to comply with the
9  necessary remedy provided by this court before it is possible to
10 enter a finding of conscious bias and illegal sub rosa policy.  To do
11 otherwise would ignore the complexities and magnitude of the largely
12 discretionary duties with which that Board is vested.

13

14                          CONCLUSION

15      The conclusive nature of the proof in this case, and the
16 suggestion of institutional bias do not preclude formulation of an
17 remedy which will guarantee adequate restrictions on, and guidance
18 for, the Board's exercise of discretion in making parole suitability
19 determinations.  The Board can be made to lawfully perform its duties
20 if given explicit instructions.

21      As noted supra, a reason the proof in this case irrefutably
22 establishes constitutional violations is because the Board does not,
23 in actual fact, operate within the limiting construction of the
24 regulations.  The Board's expansive interpretation allows it to
25 operate without any true standards.  Although numerous rulings of
26 both state and federal courts of appeal have invalidated the Board's
27 application of the §2402(c) criteria to particular facts, the Board

28



1  does not take guidance from these binding precedents and ignores them
2  for all other purposes.  In the most recent of these cases, *In re*
3  *Roderick*, (2007) ___ Cal.App.4th ___ (A113370) the First District
4  held four of five §2402 factors "found" by the Board to be
5  unsupported by any evidence.  At footnote 14 the court took the time
6  to criticize the Board for its repeated use of a "stock phrase"
7  "generically across the state."  The court also clarified that "at
8  minimum, the Board is responsible for articulating the grounds for
9  its findings and for citing to evidence supporting those grounds."
10  There is nothing in the evidence presented that would allow any
11  conclusion but that, without intervention of the Courts, the Board
12  will ignore the lessons of these rulings in the future and continue
13  to employ its formulaic approach of citing a criteria from
14  §2402(c)(1), repeating the facts of the crime, but never
15  demonstrating a logical connection between the two.  This is the
16  core problem with the Board's methodology -- they provide no
17  explanation or rationale for the findings regarding the crime itself.
18  This practice results in violence to the requirements of due
19  process and individualized consideration which are paramount to the
20  appropriate exercise of its broad discretion.
21  The only solution is one that compels the Board to identify the
22  logical connection between the facts upon which it relies and the
23  specific criteria found to apply in the individual case.  For
24  example, the Board often finds that an inmate's motive is "trivial"
25  without ever suggesting why, on these facts, that motive is not just
26  as trivial as the motive behind any other murder.  What motive is not
27  trivial?  By any definition "trivial" is a word of comparison and
28

27

1 | only has meaning when there can be examples that are not "trivial."

2 |     Similarly, although the Sixth District made it plain four years

3 | ago that "all [] murders by definition involve some callousness," (*In*

4 | *re Smith* (2003) 114 Cal.App.4th 343, 345,) the Board has continued to

5 | deny countless paroles labeling the crime "callous" without ever

6 | suggesting what crime would not qualify as "callous" and without

7 | consistently explaining why the individual case before it

8 | demonstrates "exceptional" callousness.

9 |     Respondent has consistently refused to suggest what possible

10 | instances of murder would not fit the Board's amorphous application

11 | of the §2402 criteria.  Citing *Dannenberg,* Respondent insists such

12 | comparative analysis is unnecessary.  Respondent fundamentally

13 | misunderstands the *Dannenberg* holding.

14 |     The PC § 3041(b) exception to the rule can only be invoked when

15 | the "gravity of the current convicted offense or offenses, or the

16 | timing and gravity of current or past convicted offense or offenses,

17 | is such that consideration of the public safety requires a more

18 | lengthy period of incarceration for this individual."  The word

19 | "gravity" is a directive for comparison just as "more lengthy"

20 | indicates a deviation from the norm.  While *Dannenberg* held there

21 | does not need to be intra case comparison for the purposes of term

22 | uniformity or proportionality, there necessarily has to be some sort

23 | of comparison for the purposes of adhering to the legislative mandate

24 | that parole is available.  This is implicit in §2402 because the

25 | qualifier "especially," in "especially heinous atrocious or cruel,"

26 | requires that some form of comparison be made.  While the original

27 | drafters of §2402 seemed to have recognized this fact, the ongoing

28 |


1 │ conduct of the Board has completely ignored it, and this is the
2 │ essence of the due process violation Petitioners have asserted.
3 │     As noted in his dissent in the recent case of *In re Roderick*,
4 │ *supra*, Justice Sepulveda would have deferred to the Board's
5 │ 'exercise' of discretion because "Board members have both training
6 │ and vast experience in this field.  They conduct literally thousands
7 │ of parole suitability hearings each year.  The Board therefore has
8 │ the opportunity to evaluate the egregiousness of the facts of a great
9 │ number of commitment offenses.  ...  The Board's training and
10 │ experience in evaluating these circumstances far exceeds that of
11 │ most, if not all, judges."  The evidence in this case, however,
12 │ suggests a flaw in granting such deference.  Since the Board
13 │ continues to place every murder in the category of offenses "tending
14 │ to show unsuitability," something is certainly wrong.  Since the
15 │ Board's vast experience is undeniable, the problem must be in the
16 │ Board's training and understanding of the distinguishing features of
17 │ the guidelines and criteria.  Although Justice Sepulveda presumes
18 │ that Board members receive substantive training, there is no evidence
19 │ before this court to suggest that it does, and substantial
20 │ circumstantial evidence to suggest that it does not.
21 │     In the vast numbers of Santa Clara County cases reviewed by this
22 │ Court, the Board's formulaic decisions regarding the commitment
23 │ offense do not contain any explanation or thoughtful reasoning.
24 │ Instead, the Board's conclusionary invocation of words from
25 │ §2402(c)(1) is linked to a repetition of the facts from the Board
26 │ report by the stock phrase: "These conclusions are drawn from the
27 │ statement of facts wherein ...."  Thereafter the inmate files a habeas
28 │

29

1  corpus petition and Respondent, after requesting an extension of
2  time, files a boilerplate reply asserting the Board's power is
3  "great" and "almost unlimited" and thus any "modicum" of evidence
4  suffices.  Respondent does not cite or distinguish the expanding body
5  of case law that is often directly on point as to specific findings
6  made.  Thereafter, if the writ is granted, the Board is directed to
7  conduct a new hearing "in compliance with 'due process" and that order
8  is appealed by Respondent.  On appeal the order is usually upheld
9  with modifications and in the end, after countless hours of attorney
10  and judicial time, the Board conducts a new two hour hearing at which
11  they abuse their discretion and violate due process in some different
12  way.

13      This system is malfunctioning and must be repaired.  The
14  solution must begin with the source of the problem.  The Board must
15  make efforts to comply with due process in the first instance.  The
16  case law published over the last five years provides ample and
17  sufficient guidelines and must be followed.  Although the Board
18  methods suggest it believes this to be optional, it is not.

19

20                          THE REMEDY

21      Thus, it is the order of this Court that the Board develop,
22  submit for approval, and then institute a training policy for its
23  members based on the current and expanding body of published state,
24  and federal, case law reviewing parole suitability decisions, and
25  specifically the application of §2402 criteria.  In addition to
26  developing guidelines and further criteria for the substantive
27  application of §2402 the Board must develop rules, policies and
28

                                30

10'd

1 | procedures to ensure that the substantive guidelines are followed.

2 | This Court finds its authority to impose this remedy to flow

3 | from the fundamental principles of judicial review announced over two

4 | centuries ago in *Marbury v. Madison* (1803) 5 U.S. (1 Cranch) 137.

5 | Citing that landmark case, the California Supreme Court has

6 | recognized "Under time-honored principles of the common law, these

7 | incidents of the parole applicant's right to 'due consideration'

8 | cannot exist in any practical sense unless there also exists a remedy

9 | against their abrogation." (*In re Sturm* (1974) 11 Cal.3d 258, 268.)

10 | In *Strum* the court directed that the Board modify its rules and

11 | procedures so that thereafter "The Authority will be required [,]

12 | commencing with the finality of this opinion, to support all its

13 | denials of parole with a written, definitive statement of its reasons

14 | therefor and to communicate such statement to the inmate concerned."

15 | (*Sturm* at p. 273.)

16 | Similarly, in the case of *Minnis, supra,* the California Supreme

17 | Court held the Board's policy of categorically denying parole to drug

18 | dealers was illegal. Based on its analysis the court there was

19 | clearly prepared to order that Board to modify its rules and

20 | procedures however such was unnecessary because the Board

21 | "voluntarily rescinded" the illegal policy. While the remedy in this

22 | case is of greater scope than that necessary in either *Strum* or

23 | *Minnis, supra,* so too has been the showing of a systematic abuse of

24 | discretion and distortion of process.

25 | The most recent case to address the court's roles and duties in

26 | overseeing the parole suitability process has been *In re Rosenkrantz,*

27 | *supra,* 29 Cal.4th 616. In that case the court explained that

28 |

31

1  judicial review of a Governor's parole determination comports with,

2  and indeed furthers, separation of powers principles because the

3  courts are not exercising "complete power" over the executive branch

4  and do not "defeat or materially impair" the appropriate exercise or

5  scope of executive duties.  (*Rosenkrantz* at p. 662.)  Citing *Strum*,

6  *supra*, the court reaffirmed that a life term inmate's "due process

7  rights cannot exist in any practical sense without a remedy against

8  its abrogation."  (*Rosenkrantz* at p. 664.)

9       The *Rosenkrantz* court also put forth what it believed was an

10  extreme example but which, unfortunately, has been shown to exist in

11  this case.  The court stated: "In the present context, for example,

12  judicial review could prevent a Governor from usurping the

13  legislative power, in the event a Governor failed to observe the

14  constitutionally specified limitations upon the parole review

15  authority imposed by the voters and the Legislature."  This is

16  exactly what the evidence in this case has proven.  As noted above

17  the Board has arrogated to itself absolute authority, despite

18  legislative limitations and presumptions, through the mechanism of a

19  vague and all inclusive, and thus truly meaningless, application of

20  standards.  The remedy this Court is imposing is narrowly tailored to

21  redress this constitutional violation.

22       The consequence of the Board's actions (of giving § 2402(c)(1)

23  such a broadly all encompassing and universal application) is that

24  they have unwittingly invalidated the basis of the California Supreme

25  Court's holding in *Dannenberg*.  The reason the four justice majority

26  in *Dannenberg* upheld the Board's standard operating procedures in the

27  face of the Court of Appeal and dissent position is because "the

28



1  Board must apply detailed standards when evaluating whether an
2  individual inmate is unsuitable for parole on public safety grounds."
3  (*Dannenberg* at p. 1096, footnote 16. See also page 1080: "the
4  regulations do set detailed standards and criteria for determining
5  whether a murderer with an indeterminate life sentence is suitable
6  for parole.") However, Petitioners in these cases have proven that
7  there are no "detailed standards" at all. Instead the Board has
8  systematically reduced the "detailed standards" to empty words. The
9  remedy this Court orders, that there truly be "detailed standards,"
10 requires the promulgation of further rules and procedures to
11 constrain and guide the Board's powers. This remedy differs in
12 specifics, but not in kind, from what courts have previously imposed
13 and have always had the power to impose.

14       The Board must fashion a training program and further rules,
15 standards and regulations based on the opinions and decisions of the
16 state and federal court cases which provide a limiting construction
17 to the criteria which are applied.[8] The Board must also make
18 provisions for the continuing education of its commissioners as new
19 case law is published and becomes binding authority. This Court will
20 not, at this point, outline the requirements and lessons to be taken
21 from the above cases. It is the Board's duty, in the first instance
22 to undertake this task. The training program, and associated rules
23 and regulations, shall be served and submitted to this Court, in
24
25 [8] While the showing and analysis in this case was limited to § 2402(c)(1), the
   conclusions that the evidence compelled, that the Board has been carelessly
   distorting and misapplying the regulations, is not so limited. Accordingly, the
26 training program that is necessary for the Board can not reasonably be limited to
   just § 2402(c)(1). Thus, to the extent case law recognizes, clarifies and
   establishes remedies for other due process violations they must also be
27 incorporated into the necessary rules and training the Board is required to abide
   by.
28

33


1 | writing, within 90 days.  Counsel for Petitioners, and any other
2 | interested parties, may submit briefs or comments within 30 days
3 | thereafter.  After receipt and review of the materials this Court
4 | will finalize the training program, and associated rules, and the
5 | Petitioners in these cases shall receive a new hearing before a Board
6 | that does not operate with the unfettered discretion and caprice
7 | demonstrated by the evidence here presented.

8 |                              **ORDER**

9 |     For the above reasons the habeas corpus petition is granted and
10 | it is hereby ordered that Petitioner be provide a new hearing which
11 | shall comply with due process as outlined above.  Respondent shall
12 | provide weekly updates to this Court on the progress of its
13 | development of the new rules and regulations outlined above.

14 |
15 |
16 |
17 | DATED:  _Aug 30_, 2007    _Linda R. Condron_
18 |                          LINDA R. CONDRON
                              JUDGE OF THE SUPERIOR COURT



19 |
20 | cc:  Petitioner's Attorney (Jacob Burland)
          Attorney General (Denise Yates, Scott Mather)
21 |
22 |
23 |
24 |
25 |
26 |
27 |
28 |

                              34

# PROOF OF SERVICE BY MAIL

I  THE UNDERSIGNED, CERTIFY THAT I AM OVER THE AGE OF EIGHTEEN (18) YEARS OF AGE. THAT I

CAUSED TO BE SERVED A COPY OF THE FOLLOWING DCOUMENT:

**ENTITLED:** HABEAS CORPUS PETITION


BY PLACING THE SAME IN AN ENVELOPE, SEALING IT BEFORE A CORRECTIONAL OFFICER,

AND DEPOSITING IT IN THE [ *UNITED STATES MAIL* ] AT AVENAL STATE PRISON AND ADDRESSEDIT

TO THE FOLLOWING:

FEDERAL DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFRONIA
U.S. COURTHOUSE
450 GOLDEN GATE AVE.,
SANFRANCISCO, CA 94102-3483


**EXECUTED ON** OCTOBER , 5 , 20 07 **AT AVENAL STATE PRISON, AVENAL CALIFORNIA**


I, _Derreck Sunderland_ **DECLARE UNDER THE PENALTY OF PERJURY UNDER THE LAW**

**OF THE STATE OF CALIFORNIA THAT THE FOREGOING IS TRUE AND CORRECT.**

**SIGNITURE OF DECLARANT**

Derreck Sunderland
**PRINT NAME OF DECLARANT**

PRO PER.